**Natalie G. Bartlett** **[redacted], Narragansett, RI 02882**
**phone [redacted]** **email [redacted]@aol.com**

---

December 27, 2005

Attorney Gardner H. Palmer, Jr.
Rodio & Brown, Ltd.
91 Friendship Street
Providence, RI 02903

Dear Attorney Palmer:

This letter is a good faith attempt to gain more responsive results to the defendant's Request for Interrogatory additional information committed but not yet provided in the defendant's letter to the plaintiff of December 22, 2005. This letter will also challenge the adequacy of the defendant's Response to the plaintiff's First Request for Admission, First Request for Interrogatories and First Request for Production of Documents.

<u>Lack of Proper Defendant Responsiveness to Plaintiff Request for Admission, Request for Interrogatories and Production for Documents</u>

In twenty nine (29) plaintiff First Request for Admission the defendant answer, in the defendant's objections to items, the defendant used all or part of the phrase, "compound, vague and ambiguous a minimum of twenty (20) times to characterize the defendant's objection. The defendant incorporated the phrase, " nor reasonably calculated to lead to the discovery of admissible evidence a minimum of twelve (12) times, "all or part of calls for legal conclusions and is argumentative" a minimum of eight (8) times and the phrase" seeks information neither relevant" a minimum of twelve (12) times.

The plaintiff considers these type of answers as not representative of a good faith or of cooperative effort on the part of the defendant in this case. It is also noteworthy that the plaintiff in efforts to comply with District of Rhode Island Court Rules stating, "For any items objected to by the defendant shall be set forth in a paper separate from the answers or response and shall recite in detail the grounds thereof. It there is an objection to part of a request and that part is separable from the remainder, the part to which there is no objection shall be answered, produced admitted". The plaintiff complied with this requirement in pages twelve (12) through fourteen (14) in the Plaintiff's Reply To Defendant's First Request For Admission To Plaintiff and is not aware of anything similar complying with this Court Rule being provided by the Defendant.

This perceived lack of proper responsiveness continued in the Defendant's Response to the Plaintiff's First Request for Production of Documents where in seventeen (17)

requests the phrase, "neither relevant nor reasonably calculated to lead to the discovery of admissible evidence" was used a minimum of eleven (11) times.

This practice continued in the defendant's response to the plaintiff's First Request for Interrogatories continuing with "neither relevant nor reasonably calculated to lead to the discovery of admissible evidence" occurred in six (6) objections and was joined with the characterization of "overly broad and unduly burdensome" in seven (7) responses.

The plaintiff believes that these type of responses are characteristically poor, are standard phrases stored in the defendant's counsel database and indicate no or very little intention to specifically address items of importance to the plaintiff's case.

Use of Federal Rule 36 to Protect Non-Management Employees from Discoverable Information.

Nowhere in this rule is the plaintiff aware of any stipulation that protects matters related to non-management employees from protection as stated by the defendant.

The plaintiff has issues with defendant management in this case for discriminatory treatment, retaliation for challenging them, tolerating a sexually implicit, hostile work environment and for bringing forth defamation of character items and collaboration with certain employees to allege disruptive behavior of the plaintiff and to create other mistruths to help justify termination of the plaintiff's employment.

Since discovery has indicated that George Sirrine, Cheryl Darcy and Dorothy McAleer are the primary employees providing statements supporting the plaintiff's alleged disruptive behavior items requested involving them, they should not be protected from discovery. In addition the type of slanderous, defamatory statements that the plaintiff is alleged to have made are in potential violation of the defendant's policy against moral harassment of employees.

George Sirrine's statement in the May 6, 2004 converation with George, Brian Gough and Emily Mohrfeld included as item 053 in your letter of December 22, 2005 to the plaintiff, "George does believe that Natalie does have some issues and that she is not stable. This statement is further support of the plaintiff's claim regarding defamation of her character and slander and the vicious statements that these employees are evidently willing to make to protect themselves or Penny Edwards and Brian Gough.

This statement coming from George Sirrine who is evidently being protected at this time from disclosure of the incident widely known by present and former APC employees where he smashed a tuna fish sandwich in Cheryl Darcy's face and threw a punch at Sharon Bleisel, is unbelievable.

In addition defendant's counsel question in the plaintiff's deposition, "Did you show your black laced panties to George Sirrine" ?, is another example that George Sirrine is willing to consider perjuring himself during future testimony.

The plaintiff complained to George Sirrine many times during the two years of her employment regarding the improper, sexually explicit comments of Cheryl Darcy. George told the plaintiff nothing could be done about it, inferring some type of protected status of Cheryl. The plaintiff believes that this is important information in this case that indicates special treatment shown to certain employees with offenses more serious than the alleged, yet unproven incidents that Sirrine, Darcy and McAleer are willing to testify that the plaintiff committed that disrupted the workplace, which indicates the possibility of existence of discriminatory practices of the defendant.

As for Dorothy McAleer, an employee who clocks in to work each day usually between 7:00 a.m. and 7:15 a.m. goes to the APC cafeteria, orders her breakfast and returns to her office desk and eats her breakfast daily while watching the news on television and also violates the APC policy on number of smoke breaks daily; what kind of character and integrity does this employee have? A company paid breakfast during the two years the plaintiff was employed. Provision of the clock- in records the plaintiff requested during discovery will validate this flawed judgement and character as well as testimony of other present and former employees.

Considering Dorothy's comments regarding her statement that the plaintiff stated that it was too bad that you can not find a terrorist to take down an airliner is untrue and has been twisted as well as the numerous other statements attributed to the plaintiff that were primarily overheard by Cheryl Darcy.

The plaintiff believes that Cheryl Darcy is a protected employee related to the Sirrine incident. The only reason the plaintiff believes that she was disciplined regarding the incident involving the throwing of the condom on the lunch table was because the plaintiff raised this issue while still employed and the defendant would be in a much weakened position if some type of action was not taken. Darcy almost daily while the plaintiff was employed made some type of improper, sexually improper comments such as, "the only reason such employee got her job is that she gave oral sex to her management".

These type of situations have frequently occurred by Darcy and former employees will be able to testify that these type of incidents occurred frequently several years before the plaintiff was employed which again supports the neglectful lack of involvement of Penny Edwards in the daily affairs of her work department and the obvious protection of Darcy that has occurred from the Sirrine incident.

It is interesting that Sue Sutherland, APC Treasurer and other APC management stated that they viewed the lunchroom condom incident as meant to be humorous. They must have changed their mind when the plaintiff complained about it.

Plaintiff Was An Average Performer In Her Job

This statement by Penny Edwards is absurd. Edwards cited plaintiff as a department leader in the plaintiff's 2002 annual performance review and cited her as a terrific collector in an email during the 2002 review period. The plaintiff's collection results were vastly superior to the remainder of her department with similar sized account responsibility (150 to 190 accounts) and her work due to the handling of scores of multi-lingual (non-English proficient Canadian accounts) was vastly more difficult than the collection responsibilities of George Sirrine and Dorothy McAleer who each handled only one to several accounts that they both had handled for several years which were in good shape while the plaintiff was employed and to Cheryl Darcy whose only responsibility in posting of customer payments was primarily administrative and much less difficult than customer collections.

Penny Edwards often criticized Natalie Bartlett in her use of email for Canadian Account collections work instead of the phone. At the end of the first quarter of 2004 the plaintiff's Canadian accounts collection results were .75 tenths of 1% over 31 days past due, the best results within the department at that time.

Penny Edward's Management Practices Contributing To Plaintiff's Discriminatory Treatment

Penny Edwards was rarely involved with her department employees on an everyday issues basis, and in writing and verbally directed her department employees to go to George Sirrine with their problems. In her performance appraisal Penny Edwards held the plaintiff to a collection's standard of 1% of total revenue over 31 days past due.

Early during 2003 Penny communicated to her collectors that the target was 5% 31 days or more past due and that the department overall was at 15% at the time. During the first quarter of 2004 Penny sent her collectors an email commending them stating that the year end collection results of 6.6% "was not too shabby considering some of our obstacles". The plaintiff achieved 3.5% over 31 days past due for that same period of 2003. Does these results sound like she should be judged as an average performer in her collection's work? It infers to the plaintiff that the average performer judgement provided her is more discriminatory than anything else.

The Issue of Providing The Plaintiff A Copy Of the Defendant's Corporate Personnel Policy Pertaining To The Administration Of Disciplinary Action To Employees

The plaintiff believes that the defendant has refused to provide the plaintiff copies of their Corporate Personnel Policy pertaining to the administration of disciplinary action to employees because it will point out discriminatory and favoritism actions shown to certain APC employees that have been proven to be guilty of certain infractions far more serious that the yet alleged, unverified actions of disruptive behavior of the plaintiff that justified employment termination.

The outline of the components provided the plaintiff by the defendant in discovery are not what was requested. The plaintiff believes that in the fair and consistent administration of this policy that employees are provided certain entitlements based upon their tenure and prior performance. The plaintiff also believes that employees who have had excellent performance are protected from termination for events occurring in a short period of time (60 to 90 days prior to termination) unless the incidents the employee is alleged to have committed are extremely severe such as theft, other unlawful conduct, fighting on company premises and use of alcohol on company premises as examples.

It is absurd to believe that a 1.5 billion company with several thousand employees such as APC does not have a detailed policy covering the desired administration of disciplinary action. And if and when this is provided as requested, what was so severe about the plaintiff's alleged, yet unproven actions to eliminate the provision of entitlement's such as warning, probation and other corrective disciplinary remedies that the plaintiff's believes exist in the defendant's corporate policy?

The summary listing of Corporate Personnel Policy sent by the defendant in discovery for the plaintiff's request was an insult to anyone knowledgeable of the of the personnel policies of corporations the size and stature of American Power Conversion Corporation.

A copy of this letter will be sent to the Court as further support of the plaintiff's memorandum in addition to the plaintiff's December 23, 2005 objection to the defendant's motion to dismiss.

Sincerely,

Natalie G. Bartlett
pro se plaintiff