**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **NATALIE GILL BARTLETT**<br>**Plaintiff** | : | |
| **VS.** | : | **C.A. No. 05-084 ML** |
| **AMERICAN POWER CONVERSION CORPORATION,**<br>**Defendant.** | : | |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant American Power Conversion Corporation ("APC") submits this Statement of Undisputed Facts in accordance with DRI LRCv 56 in connection with APC's Motion for Summary Judgment submitted herewith.

**A. Plaintiff's Wrongful Termination Claim – Count I**

1. Mrs. Bartlett was an at-will employee and either she or APC could end the employment relationship at any time with or without cause. *Ex. B at p. 45, ll. 7-21; Ex. C at p. 13, ll. 11-12.*

**B. Plaintiff's Age Discrimination Claim – Count II**

2. APC hired Mrs. Bartlett on April 29, 2002 as an Accounts Receivable Collections Representative when she was age 61. *Plaintiff's Admission No. 7 (hereinafter "Ex. A"); Bartlett Depo. Vol. I, 11/22/05 at p. 88, ll. 4-5 (hereinafter "Ex. B").*

3. Mrs. Bartlett's supervisor, Penny Edwards, then 51, was the principal decision-maker in her hiring. *Ex. A, No. 8; Ex. B at p. 86, l. 13 – p. 8, l. 9; p. 88, ll. 8-11.*

4. Mrs. Bartlett was 63 when she was terminated. *Ex. A, No. 11.*

5. On May 10, 2004, when Mrs. Bartlett was terminated, the Accounts Receivable team was made up of 9 employees, 1 of whom was under age 40, 2 of whom were over 40 but not yet 50, and 6 of whom were age 50 or over. *APC Interrogatory*

*Answer No. 2 (spreadsheet) (hereinafter "Ex. D"); see also Ex. A, No. 11; Ex. B at p. 88, ll. 6-7; p. 89, l. 13 – p. 90, l. 15; p. 92, ll. 16-21.*

6. Of the 6 employees over 50, 3 were over 60, including Mrs. Bartlett. *Ex. D, No. 2.*

7. The other two "over 60s" in Mrs. Bartlett's department of nine were not terminated and, in fact, one of them, George Sirrine, received a promotion to supervisor of the restructured Accounts Receivable team at about the same time that Mrs. Bartlett was let go. *Ex. B at p. 90, ll. 7-21.*

8. Mrs. Bartlett believes that the other over 60 employee, Dorothy McAleer, was the recipient of unwarranted friendship-based favoritism from their supervisor. *Ex. B at p. 146, l. 14 – p. 147, l. 1.*

9. Penny Edwards, then one day short of her 54th birthday, was one of the primary decision-makers with respect to Mrs. Bartlett's termination. *Ex. A, Nos. 10, 13; Ex. D, No. 2*

10. The decision to terminate Mrs. Bartlett was affirmed and implemented by APC's Treasurer, Susan Sutherland, who was then 58. *Ex. A. Nos. 14-16, 18; Ex. B at p. 49, l. 1 – p. 50, l. 25.*

11. The reasons Treasurer Sutherland gave to Mrs. Bartlett for her termination were that Sutherland was reorganizing the Accounts Receivable department, Mrs. Bartlett did not fit in and Mrs. Bartlett had caused problems within the department. *Ex. B at p. 49, l. 1 – p. 50, l. 25; p. 53, l. 15 – p. 54, l. 10.*

12. An employer would be justified in terminating an employee if she caused problems with other employees. *Ex. B at p. 79, ll. 16-20.*

13. APC did not directly or indirectly mention or reference Mrs. Bartlett's age. *Ex. B at p. 66, ll. 7-17.*

**Events Leading to Termination**

14. Mrs. Bartlett treated her supervisor, Penny Edwards, with contempt and disdain and expressed an air of superiority over everyone else in her department, including her supervisor.[1]

15. When it was time to receive her annual performance review in March 2004, Mrs. Bartlett's email response to her supervisor's email request to meet was: "Thanks but I would rather have a colonoscopy plus a gyn exam together with massive blood work ..." *Bartlett Depo. Vol. II, 11/28/05 at p. 131, l. 113 – p. 132, l. 20 (hereinafter "Ex. C").*

16. During her Performance Appraisal on March 22, 2004, Mrs. Bartlett took offense to any rating that was a Meets Expectations or Needs Improvement and challenged Ms. Edwards forcefully and hostilely throughout the review. *Ex. B at p. 56, ll. 7-16; p. 68 l. 6 - p. 69, l. 23; Ex. C at p. 118, ll. 8-16.*

[1] Mrs. Bartlett expressed her superiority and her disdain for her supervisor and co-workers in the period following her Performance Appraisal and throughout the EEOC claims process and this litigation. Referring to her supervisor, Mrs. Bartlett said "At APC I was dealing with a potato in the form of Penny Edwards so I had no expectations." *Ex. C at p. 92, ll. 9-10.* Mrs. Bartlett admitted that she "didn't get along with Dorothy McAleer. I had no respect for Dorothy McAleer" and said that "Dorothy is a very crude individual who wears a dirty wig every day and leaned over the cubicle one day and told me that, you know, I 'm really a man ..." *Ex. C at p. 111, ll. 11-13; p. 123, ll. 9-13.* Mrs. Bartlett believed about another co-worker, that "Quite frankly, Cheryl Darcy is the lowest form of humanity." *Ex. C at p. 26, ll. 7-8.* Mrs. Bartlett referred to another co-worker, George Sirrine, as "a very nice man but pathetic." *Ex. C at p. 110, ll. 23-24.* There are other uncited examples.

As for her opinion of herself, she referred to her "significantly superior comparative performance" *(Ex. C at p. 150, ll. 6-14)*, that her 2003 performance "justifies an exceptional evaluation as compared to all of the other collectors in our department" *(Ex. C at p. 151, ll. 8-21)*, that her "collection results are already vastly superior to department employees" *(Ex. C. at p. 153, ll. 6-12)*, that her personal character has been "flawless throughout her life" *(Ex. C at p. 153, l. 21 - p. 154 l. 17)* and that "I have perfect conduct." *Ex. C at p. 74, l. 1).* There are other uncited examples.

17. Instead of focusing on her own performance, Mrs. Bartlett brought up others in her department who she believed to be inferior to her and criticized their performance. *Ex. C at p. 118, l. 8 – p. 119, l. 6; Ex. D, No. 6.*

18. Immediately following her review, during a meeting with Edwards and Edwards' then supervisor, Brian Kelly, called to address Mrs. Bartlett's suggestion that a female co-worker (Cheryl Darcy) made an inappropriate sexual remark several months prior, Mrs. Bartlett was again aggressive and improperly wanted to focus on her perceived poor performance review rather than the allegation of sexual misconduct Mrs. Bartlett made during the review. *Ex. D, No. 6; Ex. B at p. 128, ll. 19-24.*

19. Edwards believed that Mrs. Bartlett approached her hostilely and threateningly after Mrs. Bartlett's handbag was searched in response to a co-worker's report that she may carry a handgun in her purse. *Ex. H; Ex. D, No. 6.*

20. Mrs. Bartlett incorrectly assumed that Edwards was the source of the report, and Edwards reported to Human Resources that Mrs. Bartlett went to Edwards' office immediately following the search, accusing Edwards of being the person who made the report and telling Edwards that someone would pay for what Mrs. Bartlett went through. *Ex. H; Ex. D, No. 6.*

21. Some of Mrs. Bartlett's co-workers expressed concerns for their safety to APC and attributed heightened tension in the workplace to certain of Mrs. Bartlett's alleged statements and conduct. *See March 31, 2004 Mohrfeld Memo; March 31, 2004 Darcy Email; April 1, 2004 Mohrfeld Email; April 1, 2004 Darcy Email ("Ex. E."); May 5, 2004 Mohrfeld Memo ("Ex. F"); May 6, 2004 Mohrfeld Memo ("Ex. G").*

22. Mrs. Bartlett's co-workers also confirmed to APC's Human Resources department that Mrs. Bartlett's conduct was disruptive and threatening. In case there was ever an incident, Cheryl Darcy wanted to be on record with Human Resources that Mrs. Bartlett was overheard stating that she carried a pistol in her purse. She also reported that Mrs. Bartlett was bitter and unhappy with some of her co-workers. *Exs. E, F, G.*

23. In the days prior to her termination, a co-worker reported, and another co-worker confirmed, an incident in which Mrs. Bartlett had asked, in substance, why can't you find a terrorist when you need one to bring down an airliner, in reference to Dorothy McAleer, a co-worker who frequently flew to Florida on weekends to be with her husband. *Exs. F, G.*

24. Dorothy McAleer reported being concerned for her safety in light of Mrs. Bartlett's behavior towards her and comments about her. *Ex. F.*

25. George Sirrine confirmed to the Human Resources department that Mrs. Bartlett caused tension in the department and questioned her stability. He also confirmed that she made inappropriate statements about wanting a terrorist to bring down a flight to Florida that Dorothy McAleer frequented and engaged in trouble-making conduct like encouraging a co-worker to report Mrs. McAleer to the IRS because she had Florida license plates. *Ex. G.*

26. Mrs. Bartlett points to three things in support of her age claim: (1) a March 22, 2004 meting with Penny Edwards and Edwards' supervisor, Brian Kelly, (2) a meeting with Human Resources Director Brian Gough in late March 2004 and (3) APC hired a 30 year old a short time after her termination. *Ex. B at p. 84, l. 22 - p. 85, l. 12.*

**The March 22, 2004 Meeting with Edwards and Kelly**

27. The March 22, 2004 meeting with Edwards and Kelly immediately followed Mrs. Bartlett's Performance Review and was called to address the allegations of improper sexual conduct that Mrs. Bartlett raised during her review. *Ex. D, No. 6; Ex. B at p. 118, l. 19 – p. 119, l. 3.*

28. At her March 22, 2004 Performance Appraisal, Mrs. Bartlett revealed for the first time an incident that occurred the prior November in the APC lunchroom at a lunch break. Several of the female Accounts Receivable employees were eating lunch and discussing Fran Wilcox's new boyfriend when Cheryl Darcy removed a packaged condom from her purse, threw it on the table and said that now Wilcox would be needing this. There is some dispute about how the women at the table reacted at the time. Cheryl Darcy indicated that Wilcox was her friend in and out of work and that the banter was intended and received as a joke (*Ex. F*), while Mrs. Bartlett maintains that everyone at the table was shocked into complete silence (*Ex. B at p. 112, ll. 12-18*).

29. Mrs. Bartlett did not bring the so-called lunchroom condom incident to the attention of anyone in management until she raised it in her defense at her March 22nd review. *Ex. B at p. 100 ll. 20-24; p. 103, l. 21 – p. 104, l. 1; p. 115, ll. 6-10.*

30. Mrs. Bartlett concluded that Edwards and Kelly thought she was too old to understand the humor in the improper sexual conduct that she had described to Edwards during the Performance Appraisal that led to the March 22, 2004 meeting. *Ex. B at p. 69, l. 24 - p. 70, l. 11.*

31. Neither Edwards nor Kelly said anything that led her to the conclusion she was too old to understand the humor in the improper sexual conduct; it was her unsubstantiated assumption. *Ex. B at p. 69, l. 24 - p. 70, l. 11.*

**Mrs. Bartlett's Meeting with Brian Gough**

32. As promised, Kelly involved the Human Resources department to investigate the condom incident. The meeting with Human Resources Director Brian Gough took place as a follow up to the March 22, 2004 meeting Mrs. Bartlett had with Edwards and Kelly relating to the alleged improper conduct. *Ex. B at p. 131, ll. 24.*

33. At the meeting, Gough informed Mrs. Bartlett that the condom incident had been investigated, Cheryl Darcy had indicated that the matter was intended as a joke, he understood that that Mrs. Bartlett did not see it as a joke and that Cheryl Darcy had been counseled. *Ex. B at p. 70, l. 12 - p. 71, l. 3.; p. 131, ll. 24; p. 132, l. 25 – p. 133, l. 4.*

**APC's Hiring of a 30 Year Old After Mrs. Bartlett's Termination**

34. Mrs. Bartlett contends variously that APC hired a woman who was 29, 30 and in her 30s and that she replaced Mrs. Bartlett immediately, within 2 or 3 weeks, and within 30 days of Mrs. Bartlett's termination. *Ex. B at p. 80, ll. 22-24; p. 81, ll. 3-12; p. 82, l. 23 -p. 83, l. 13.*[2]

35. As to how the hiring establishes age discrimination, Mrs. Bartlett says: "Well, if you're 63 and you're terminated for reasons you don't understand, and you are replaced by somebody who is 29, what – what other conclusion would you come to?" *Ex. B at p. 83, ll.19-25.*

[2] Although APC disputes the particulars of Mrs. Bartlett's various contentions, it accepts for purposes of this motion that a younger woman assumed many of Mrs. Bartlett's accounts within a few months of her termination. This woman, like Mrs. Bartlett before her, had already been performing a similar function for APC as a temporary employee on assignment to APC. Several months after Mrs. Bartlett's termination, she moved from her temporary assignment to become an APC employee.

36. Mrs. Bartlett thought she was treated differently than the other two 60 year olds in her department solely because she challenged her supervisors' management authority, not because of her age. *Ex. B at p. 93, l. 12 - p. 94, l. 3.*

37. APC's decision to terminate Mrs. Bartlett had nothing to do with her age and was not in retaliation for any protected conduct. *Ex. D, Nos. 6, 7.*

**C. Plaintiff's Hostile Work Environment Claim – Count III**

38. Mrs. Bartlett was not subjected to a hostile environment at APC on the basis of her sex or any other protected classification. *Ex. B at p. 134, ll. 2-5; p. 136, l. 22 - p. 138, l. 7.*

39. Although Mrs. Bartlett's hostile environment claim is not based on membership in any protected class, in her view, it does not have to be. *Ex. B at 136, l. 22 - p. 138, l. 7; p. 138, l. 25 - p. 139, l. 5.*

40. The first and only report of "improper sexual conduct" she made to her supervisor or someone in a position of authority was at her March 22, 2004 Performance Appraisal, and APC immediately addressed the report. *Ex. B at p. 101, ll. 20-24; p. 132, l. 24 – p. 135, l. 4.*

41. Mrs. Bartlett did not report any of the other so-called evidence of hostile environment to her supervisor or anyone in authority. *Ex. B at p. 135, l. 24 – p. 136, l. 10.*

42. The incidents that Mrs. Bartlett claims are evidence of the hostile work environment are:

- The lunchroom condom incident involving Cheryl Darcy and Fran Wilcox *Ex. B at p. 110, l. 13 – p. 114, l. 3;*
- That Beau Lifsey was allegedly allowed to work drunk for 18 months *Ex. B at 133, ll. 5-18; p. 134, l. 22 – p. 135, l. 2;*
- That Cheryl Darcy joked that an APC employee outside of the Accounts Receivable department who wore braces got her position by performing oral sex

on her APC management and that was why she needed braces *Ex. B at p. 159, l. 14 – p. 162, l. 1;*

- That the Accounts Receivable department was dysfunctional with no supervision *Ex. B at p.136, l. 11 – p. 139, l. 5;*
- That there was bickering among the women in the department *Ex. B at p. 139, l. 6 – p. 144, l. 17;*
- That Penny Edwards showed favoritism to Mrs. Bartlett's 61 year old co-worker, Dorothy McAleer *Ex. B at p. 145, l. 6 – p. 151, l. 9*; and
- That a co-worker was involved in an incident with a tuna fish sandwich before Mrs. Bartlett began working for APC *Ex. B at p. 162, l. 23 – p. 170, l. 9.*

43. APC swiftly investigated Mrs. Bartlett's report of the lunchroom condom incident and took appropriate remedial action. *Ex. B at p. 118, l. 19 - p. 119, l. 4; p. 120, ll. 18-23; p. 122, ll. 3-16; p. 124, l. 25 - p. 126, l. 24; p. 131, ll. 4-7, 18-24; p. 132, l. 25 - p. 133, l. 4.*

44. Mrs. Bartlett did not consider the incident to be sexual harassment. *Ex. B at p. 122, ll. 10-16.*

45. Mrs. Bartlett was upset that the March 22, 2004 meeting with Edwards and Kelly was convened to address the allegations of sexual impropriety that she first raised during her performance review because she wanted the meeting to focus on "the equity and accuracy of the annual performance appraisal." Mrs. Bartlett wrote to Edwards and Kelly: "During the discussion with Brian Kelly, the main discussion appeared to be focused upon the issue of sexual impropriety within our department that I raised . . . The situation in question is not sexual harassment which you and Brian have construed it to be ..." *Ex. B at p. 124, l. 25 – p. 128, l. 24.*

46. All but one of the Accounts Receivable employees were female, and there is no suggestion that the lone male was involved in the supposed improper sexual conduct. *Ex. D, No. 2.*

47. The "hostile" environment to which Mrs. Bartlett refers was the dysfunctional relationship that existed with her female co-workers and supervisor whom did not get along with each other. *Ex. B at p. 143, l. 13 - p. 144, l. 17.*

48. The bickering among her female co-workers that Mrs. Bartlett cites as evidence of an unlawful hostile environment refers to "constant fights that went on in the – in the department between women, between collectors" that were the product of the dislike of several of the collectors for each other. *Ex. B at 139, ll. 11-13; p. 144, ll. 8-17.*

49. The favoritism that Edwards allegedly displayed toward Dorothy McAleer (61 years old when Mrs. Bartlett was terminated) was not based on any protected class, but was based on friendship. *Ex. B at p. 150, l. 11 – p. 151, l. 4.*

50. The tuna fish sandwich incident took place before Mrs. Bartlett's arrival at APC. *Ex. B at p. 167, ll. 5- 24.*

51. Mrs. Bartlett's understanding of the incident is based on the hearsay reports of third parties. *Ex. B at p. 165, l. 13; p. 167, l. 5 – p. 168, l. 3.*

52. As to the individual involved in the incident, George Sirrine, Mrs. Bartlett believes "George is a lovely, lovely man" and "George and I got along very well. We were quite close as a matter of fact." Sirrine never did anything to lead Mrs. Bartlett to believe that there was any problem between him and her. *Ex. B at p. 164, l. 17 - p. 165, l. 1; p. 166, ll. 4-15.*

53. Mrs. Bartlett contends that she was, by far, her department's best performer. None of the incidents were sufficiently severe and pervasive so as to alter the conditions of Mrs. Bartlett's employment and create an abusive work environment. *See n.1 supra; Ex. C at p. 73, ll. 13-18.*

54. APC has in place policies and procedures for addressing hostile environment and other discrimination related complaints. *Ex. B at p. 40, l. 14 – p. 44, l. 3.*

55. Mrs. Bartlett knew APC's procedures allowed her to bring complaints to her supervisor, other members of management and to the Human Resources department. *Ex. B at p. 36, ll. 6-18; p. 40, l. 14 – p. 44, l. 3.*

**D. Mrs. Bartlett's Retaliation Claim – Count IV**

56. Mrs. Bartlett claims that once she challenged Penny Edwards during her March 22, 2004 Performance Appraisal because of her dispute over her March 22, 2004 Performance Appraisal and Edwards' management style, APC began to retaliate against her. *Ex. C at p. 15, l. 12 – p. 16, l. 9.*

57. The alleged retaliation was for challenging Edwards relating to her dispute over her March 22, 2004 Performance Appraisal and Edwards' management style, *and for no other reason. Ex. C at p. 16, l. 10 - p. 17, l. 15.*

58. Mrs. Bartlett points to the following actions as being retaliatory conduct:

- Edwards caused her to be summoned to meet with HR Director Gough *Ex. C at p. 17, ll. 16-21;*
- Edwards colluded with others to set her up for a search for guns and knives *Ex. C at p. 18, l. 12 – p. 19, l. 6;*
- Edwards and Gough colluded with Darcy, McAleer, Sirrine to cause them to make statements to HR about Mrs. Bartlett *Ex. C at p. 19, ll. 7-11;*
- Gough and APC's attorney improperly convinced the EEOC not to investigate her claim *Ex. C at p. 22, l. 7 – p. 25, l. 11;* and
- Gough retaliated against her by feeding information about Mrs. Bartlett's alleged Rhode Island mob membership to APC's attorney for disclosure to the EEOC in APC's Position Statement *Ex. C at p. 42, ll. 7-25.*

**Mrs. Bartlett's meeting with HR Director Gough**

59. Mrs. Bartlett's meeting with HR Director Gough was called so that Mrs. Bartlett could discuss with Gough her dissatisfaction with her Performance Appraisal. *Ex. C at p. 17, l. 16 – p. 18, l. 8.*

60. At that meeting, Gough told her that she could prepare her own rebuttal to Edwards' Performance Appraisal and it would be included in her personnel file along with Edwards' Performance Appraisal. *Ex. C at p. 17, l. 16 – p. 18, l. 8.*

**Mrs. Bartlett's Allegations of Collusion**

61. Mrs. Bartlett's collusion allegations are based on speculation, conjecture and personal opinion. *Ex. C at p. 20, l. 12 – p. 21, l. 9; p. 23, ll. 11-25.*

62. The performance rating and the review Mrs. Bartlett received on March 22, 2004 were not in retaliation for anything. *Ex. C at p. 21, ll. 19-22.*

63. All of the actions that Mrs. Bartlett claims were retaliatory took place after Mrs. Bartlett strongly disagreed with Edwards' assessment of her performance. *Ex. B at p. 57, ll. 7-16.*

**Mrs. Bartlett's Co-workers' Reports to Human Resources**

64. Cheryl Darcy, Dorothy McAleer and George Sirrine actually made the reports to Human Resources that Mrs. Bartlett says caused her to be retaliated against. *Ex. D, Nos. 6, 7, 10; Exs. F, G, H*

65. APC had a right to make employment decisions based on those reports. *Ex. B at p. 79, ll. 16-20.*

**E. Mrs. Bartlett's Claims of Defamation, Libel and Slander – Count V**

66. Mrs. Bartlett identifies the following statements as defamatory, libelous and slanderous:

- APC said that Mrs. Bartlett carried a gun and knives *Ex. C at p. 44, ll. 1-6;*
- APC searched her handbag for a handgun *Ex. C at p. 44, l. 6;*
- APC's attorney's statement to the EEOC that Mrs. Bartlett was a member of the Rhode Island mob *Ex. C at p. 44, ll. 6-8;*
- Susan Sutherland's comment that Mrs. Bartlett caused problems within the department *Ex. C at p. 44, ll. 8-10;*
- APC's Interrogatory Answer and EEOC Position Statement stating "some nonsense about a terrorist on a plane" *Ex. C at p. 44, ll. 14-17; p. 62, l. 20 - p. 63, l. 1;*
- APC's Interrogatory Answer relating Cheryl Darcy's comment that Mrs. Bartlett carried knives and guns, and that Darcy was not afraid of Mrs. Bartlett but sometimes people snap *Ex. C at p. 44, ll. 17-19;*
- It was made known that Mrs. Bartlett was not an employee in good standing and was terminated *Ex. C at p. 44, ll. 19-23; p. 65, ll. 9-15;*
- APC advised the state unemployment office that Mrs. Bartlett was terminated for poor performance *Ex. C at p. 45, ll. 2-5.*

**APC's Statement that a Co-worker Reported that Mrs. Bartlett Carried a Gun**

67. The first claimed defamatory statement is based on Brian Gough's statement *to Mrs. Bartlett* that a co-worker had reported to Human Resources that she might carry a handgun. *Ex. C at p. 47, ll. 4-13.*

68. The statement was made in connection with APC's search of Mrs. Bartlett's handbag, a search that she acknowledges APC had the right and duty to conduct. *Ex. C at p. 53, ll. 2-9.*

**APC's Handbag Search**

69. APC's search of Mrs. Bartlett's handbag was neither an oral or written statement. It was an action that APC conducted as part of its efforts to insure compliance with its policies. Mrs. Bartlett accepts and understands APC's search

policy; she just doesn't think it should be applied to her. *Ex. C at p. 50, ll. 14-20; p. 53, ll. 2-9.*

## APC's EEOC Position Statement

70. The co-workers' reports that Mrs. Bartlett touted her connections to the Rhode Island mob by claiming she could pick up the phone and have certain situations taken care of that APC submitted to the EEOC were actually made to the Human Resources department. *Exs. E, F; Ex. D, No. 10.*

## Sutherland's Exit Interview with Mrs. Bartlett

71. The fourth communication underlying Mrs. Bartlett's defamation claim is the explanation that Susan Sutherland gave *to Mrs. Bartlett* for her termination in her exit interview - that Mrs. Bartlett caused problems with others in the department. *Ex. C at p. 57, ll. 3-25.*

## APC's Interrogatory Answer and EEOC Position Statement – Co-worker Reports Concerning Mrs. Bartlett's Terrorist Remark

72. In APC's Interrogatory Answer and EEOC Position Statement, APC repeated the reports made to APC by co-workers that Mrs. Bartlett had expressed a wish that a terrorist would bring down the plane that Dorothy McAleer flew on to visit her husband in Florida as an example of the kind of comments involving co-workers that led to Mrs. Bartlett's termination. *Ex. C at p. 61, l. 8 – p. 63, l. 1.*

73. APC did not state to the EEOC that Mrs. Bartlett actually made the terrorist statement, but was simply restating what had been reported to APC. *Ex. C at 63, ll. 2-9.*

**APC's Interrogatory Answer and EEOC Position Statement – Co-worker Report Concerning Guns, Knives, Concern about People Snapping**

74. The sixth statement that Mrs. Bartlett cites is from APC's Interrogatory Answer and EEOC Position Statement in which APC related that Cheryl Darcy had made a statement to APC that Mrs. Bartlett had access to guns and knives and was concerned because people sometimes snap. *Ex. C at p. 67, ll. 1-21.*

75. Darcy made the report to APC. *Ex. E; Ex. D, No. 10.*

76. Mrs. Bartlett told her co-workers that she and her husband were members of gun clubs, that she had used firearms throughout her life and she was very proud of her use and access to guns. *Ex. C at p. 119, l. 12 – p. 120, l. 23.*

**Rumors that Mrs. Bartlett was not an Employee in Good Standing**

77. Mrs. Bartlett claims that APC defamed her when it was made known that she was no longer an employee in good standing. *Ex. C at p. 67, l. 25 – p. 68, l. 4.*

78. Mrs. Bartlett cannot identify anyone at APC who actually made such an oral or written statement. *Ex. C at p. 68, l. 18 – p. 69, l. 20; p. 71, l. 17 – p. 72, l. 11*

79. That she was not in good standing was a rumor and she heard from others that employees were gossiping about her not being in good standing. *Ex. C at p. 68, l. 18 – p. 69, l. 20.*

**APC's Report to the RI Department of Labor & Training**

80. APC reported to the Rhode Island Department of Labor & Training ("DLT"), on a form that is required to be submitted to the DLT that calls for a short explanation of the reason for an employee's separation, that Mrs. Bartlett had been terminated for poor performance. *Ex. C at p. 72, ll. 12-17.*

**Natalie Gill Bartlett**
**vs.**
**American Power Conversion**
**Corporation, *et al.***
**C.A. No. 05-084 ML**

AMERICAN POWER CONVERSION
CORPORATION
By its Attorneys,

Gardner H. Palmer, Jr. Esq. (#3707)
RODIO & BROWN, LTD.
91 Friendship Street
Providence, RI 02903
401 274-4040
401 274-4099 Fax
gpalmer@rodiobrown.com

Date: January 16, 2006

**CERTIFICATION**

Natalie Gill Bartlett
45 Lakeside Drive
Narragansett, RI 02882

I hereby certify that I sent a copy of the within document to the party listed above by regular, first class mail, postage prepaid on the 17th day of January, 2006.