**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **NATALIE GILL BARTLETT** **Plaintiff** | : | |
| | : | |
| **VS.** | : | **C.A. No. 05-084 ML** |
| | : | |
| **AMERICAN POWER CONVERSION CORPORATION,** **Defendant.** | : | |

**DEFENDANT AMERICAN POWER CONVERSION CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

Defendant, American Power Conversion Corporation ("APC"), pursuant to Federal Rule of Civil Procedure 56, moves this Court for an Order granting APC summary judgment on Counts I-V of Plaintiff Natalie Gill Bartlett's Complaint because there are no genuine issues of material fact and APC is entitled to judgment as a matter of law.

In support of this Motion, Defendant respectfully refers the Court to the accompanying Memorandum in Support, APC's Statement of Undisputed Facts and the attached exhibits, all of which are made a part hereof.

AMERICAN POWER CONVERSION
CORPORATION
By its Attorneys,

Gardner H. Palmer, Jr. Esq. (#3707)
RODIO & BROWN, LTD.
91 Friendship Street
Providence, RI 02903
401 274-4040
401 274-4099 Fax
gpalmer@rodiobrown.com

Date: January 16, 2006

**Natalie Gill Bartlett**
**vs.**
**American Power Conversion**
**Corporation, *et al.***
**C.A. No. 05-084 ML**

## CERTIFICATION

Natalie Gill Bartlett
45 Lakeside Drive
Narragansett, RI 02882

I hereby certify that I sent a copy of the within document to the party listed above by regular, first class mail, postage prepaid on the 17th day of January, 2006.

Helena Amaral

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NATALIE GILL BARTLETT<br>Plaintiff | : | |
| VS. | : | C.A. No. 05-084 ML |
| AMERICAN POWER CONVERSION CORPORATION,<br>Defendant. | : | |

**DEFENDANT AMERICAN POWER CONVERSION CORPORATION'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff Natalie Gill Bartlett filed suit against Defendant American Power Conversion Corporation ("APC") on or about February 23, 2005, alleging five counts (a) wrongful termination; (b) age discrimination; (c) hostile work environment; (d) retaliation for whistleblowing; and (e) defamation, libel and slander of character. APC asks the Court to grant it summary judgment on all counts of Plaintiff's Complaint because the claims cannot be sustained as a matter of fact or law.

**Summary of Facts**

APC hired Mrs. Bartlett on April 29, 2002 as an Accounts Receivable Collections Representative at age 61. Her supervisor, Penny Edwards, then 51, was the principal decision-maker in her hiring. On May 10, 2004, when Mrs. Bartlett was terminated at age 63, the Accounts Receivable team was made up of 9 employees, 1 of whom was under age 40, 2 of whom were over 40 but not yet 50, and 6 of whom were age 50 or over. Of the 6 employees over 50, 3 were over 60, including Plaintiff. One of the primary decision-makers with respect to Mrs. Bartlett's termination was Edwards, then one day short of her 54th birthday. APC's Treasurer, Susan Sutherland, then 58, also approved the termination. *Ex. A, Nos. 7-11, 13-16, 18, 19; Ex. B at p. 86, l. 14 – p. 93, l. 1.*

APC terminated Mrs. Bartlett because of her disruptive behavior, her hostile and disrespectful conduct toward her supervisor and her unpleasant interactions with her co-workers. Her relationship with her supervisor in particular deteriorated as a result of Mrs. Bartlett's unwarranted overreaction to what she believed was a poor performance appraisal on March 22, 2004.

Characteristic of Mrs. Bartlett's caustic workplace demeanor was her email response to her supervisor's email message that it was time to receive her annual performance review. Mrs. Bartlett wrote to Edwards: "Thanks but I would rather have a colonoscopy plus a gyn exam together with massive blood work . . ." *Ex. C at p. 131, l. 113 – p. 132, l. 20.* Also, in the days prior to her termination, a co-worker reported an incident in which Mrs. Bartlett asked, in substance, why can't you find a terrorist when you need one to bring down an airliner, in reference to a co-worker who frequently flew to Florida on weekends to be with her husband. Some co-workers expressed concerns for their safety to APC because of Mrs. Bartlett's alleged statements. Mrs. Bartlett created increasing dissension in her department in the weeks leading up to her termination, and APC decided that she had to go. The decision had nothing to do with her age and was not in retaliation for any protected conduct. *Ex. D, Nos. 6, 7.*

Additional facts will be referenced in connection with APC's discussion of the individual legal claims Mrs. Bartlett asserts.

## II. ARGUMENT

### 1. This Court should grant summary judgment on Plaintiff's wrongful termination claim because it is not cognizable under Rhode Island law.

Count I asserts that Mrs. Bartlett was wrongfully terminated "representing discriminatory treatment inconsistent with employer's personnel policy..." She does

not identify the protected status that her allegedly discriminatory treatment stems from, nor does she articulate the personnel policies that APC is alleged to have inconsistently applied. In any event, Mrs. Bartlett admits that she was an at-will employee and that either she or APC could end the employment relationship at any time with or without cause. *Ex. B at p. 45, ll. 7-21; Ex. C at p. 13, ll. 11-12.*

Accordingly, this claim cannot survive because there is no cause of action for wrongful termination for at-will employees under Rhode Island law. Rhode Island employees hired for an indefinite period with no contractual right to continued employment are at-will employees subject to discharge at any time for any permissible reason or for no reason at all. *Volino v. General Dynamics*, 539 A.2d 531, 532 (R.I. 1998); *see also Saccoccia-Miller v. Target Corporation*, Memorandum and Order at 4-5, (Lisi, J. 10/11/05).

**2. Plaintiff's age discrimination claim fails because there is no genuine issue of material fact that age played any part in Plaintiff's termination.**

Mrs. Bartlett claims in Count II that she was terminated due to unlawful age discrimination. Under the Age Discrimination in Employment Act:

> It shall be unlawful for an employer–
>
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
>
> (3) to reduce the wage rate of any employee in order to comply with this chapter. *29 U.S.C. § 623(a).*

It is difficult to see how Mrs. Bartlett could conclude that APC made its termination decision on the basis of her age. APC hired Mrs. Bartlett when she was age 61. She was 63 when terminated. All but one of her entire department was over 40, most were over 50, three were 60 or over and Mrs. Bartlett was hired and fired by the same person, who herself was over 50. The decision to terminate Mrs. Bartlett was affirmed and implemented by APC's Treasurer, Susan Sutherland, who was almost 60. *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993) (strong inference of no age discrimination where hirer and firer are the same, firer is in protected class and others retained are close in age to plaintiff).

The other two "over 60s" in her department of nine were not terminated and, in fact, one of them received a promotion to supervisor of the restructured Accounts Receivable team at about the same time that Mrs. Bartlett was let go. Mrs. Bartlett incongruously complains that the other over 60 employee was the recipient of unwarranted friendship-based favoritism from their supervisor. Mrs. Bartlett is the only one who ever directly or indirectly mentioned her age.

To prove a claim of discrimination under the Age Discrimination in Employment Act, Mrs. Bartlett must prove that (a) she was within the protected age group (≥ 40), (b) she was qualified for the position, (c) she was discharged or demoted, and (d) her discharge occurred under circumstances giving rise to an inference of discrimination. Mrs. Bartlett must prove that, but for her age, she would not have been terminated. *Thomas v. Sears, Roebuck & Co.*, 144 F.3d 31, 33 (1st Cir. 1998). It is not enough for a plaintiff to show that the employer's stated reason was pretext; she must also show that

it was a pretextual statement designed to cover up the employer's true reason – age discrimination. *Id.*

For purposes of this motion, APC concedes the first three elements of this cause of action. However, Mrs. Bartlett cannot demonstrate that her age had anything to do with her termination. Thus, Mrs. Bartlett cannot establish a *prima facie* case of age discrimination. Even if she could establish a *prima facie* case, APC has offered legitimate non-discriminatory reasons for her termination. Mrs. Bartlett cannot meet her burden to show that APC's stated reasons were a pretext for unlawful age discrimination or that age was the reason for her termination, which she must do under the traditional burden-shifting framework. *Id.* (articulating burden shifting standard for age claim).

Mrs. Bartlett acknowledges that the reasons Sutherland gave to her for her termination were that Sutherland was reorganizing the Accounts Receivable department, Mrs. Bartlett did not fit in and Mrs. Bartlett had caused problems within the department. *Ex. B at p. 53, l. 15 – p. 54, l. 5.* Mrs. Bartlett further acknowledges that an employer would be justified in terminating an employee if she caused problems with other employees. *Ex. B at p. 79, ll. 16-20.*

APC terminated Mrs. Bartlett after a series of outbursts that stemmed from her obvious displeasure with the Performance Appraisal she received from her supervisor, Penny Edwards. Mrs. Bartlett's reaction was, in turn, an expression of the lack of respect that Mrs. Bartlett displayed toward her supervisor. She treated her supervisor with contempt and disdain and expressed an air of superiority over everyone else in her department, including her supervisor.[1]

[1] In fact, Mrs. Bartlett expressed her superiority and her disdain for her supervisor and co-workers many times in the period following her Performance Appraisal and throughout the EEOC claims process and

During her Performance Appraisal on March 22, 2004, Mrs. Bartlett took great offense to any rating that was a Meets Expectations or Needs Improvement and challenged Ms. Edwards forcefully and hostilely throughout the review. *Ex. B at p. 56, ll. 7-16; p. 68 l. 6 - p. 69, l. 23; Ex. C at p. 118, ll. 8-16.* Instead of focusing on her own performance, Mrs. Bartlett brought up others in her department who she believed to be inferior to her and demeaned their performance. *Ex. C at p. 118, l. 8 – p. 119, l. 6; Ex. D, No. 6.* Immediately following her review, during a meeting with Edwards and Edwards' then supervisor, Brian Kelly, called to address Mrs. Bartlett's suggestion that a female co-worker (Cheryl Darcy) made an inappropriate sexual remark several months prior, Mrs. Bartlett was again aggressive, and improperly wanted to focus on her perceived poor performance review rather than the allegation of sexual impropriety Mrs. Bartlett made during the review. *Ex. D, No. 6.*

Mrs. Bartlett also approached Edwards hostilely and threateningly after Mrs. Bartlett's handbag was searched in response to a co-worker's report that she may carry a handgun in her purse. *Ex. H.* Mrs. Bartlett incorrectly assumed that Edwards was the source of the report and barged into her office immediately following the search,

---

this litigation. Referring to her supervisor, Mrs. Bartlett said "At APC I was dealing with a potato in the form of Penny Edwards so I had no expectations." *Ex. C at p. 92, ll. 9-10.* Mrs. Bartlett admitted that she "didn't get along with Dorothy McAleer. I had no respect for Dorothy McAleer" and said that "Dorothy is a very crude individual who wears a dirty wig every day and leaned over the cubicle one day and told me that, you know, I 'm really a man . . ." *Ex. C at p. 111, ll. 11-13; p. 123, ll. 9-13.* Mrs. Bartlett believed about another co-worker, that "Quite frankly, Cheryl Darcy is the lowest form of humanity." *Ex. C at p. 26, ll. 7-8.* Mrs. Bartlett referred to another co-worker, George Sirrine, as "a very nice man but pathetic." *Ex. C at p. 110, ll. 23-24.*

As for her opinion of herself, she referred to her "significantly superior comparative performance" *(Ex. C at p. 150, ll. 6-14)*, that her 2003 performance "justifies an exceptional evaluation as compared to all of the other collectors in our department" *(Ex. C at p. 151, ll. 8-21)*, that her "collection results are already vastly superior to department employees" *(Ex. C. at p. 153, ll. 6-12)*, that her personal character has been "flawless throughout her life" *(Ex. C at p. 153, l. 21 - p. 154 l. 17)* and that "I have perfect conduct." *Ex. C at p. 74, l. 1).*

accusing her of being the person who made the report and telling her that someone would pay for what she went through. *Ex. D, No. 6.*

Mrs. Bartlett's co-workers also confirmed to APC's Human Resources department that Mrs. Bartlett's conduct was disruptive and threatening. Cheryl Darcy wanted to be on record with Human Resources that Mrs. Bartlett was overheard saying she carried a pistol in her purse in case there was ever an incident. She also reported that Mrs. Bartlett was bitter and unhappy with some of her co-workers and that people sometimes snap. *Ex. E.* Dorothy McAleer reported being concerned for her safety in light of Mrs. Bartlett's behavior towards her and comments about her. *Ex. F.* George Sirrine confirmed to HR that Mrs. Bartlett caused tension in the department and questioned her stability. He also confirmed that she made inappropriate statements about wanting a terrorist to bring down a flight to Florida that Dorothy McAleer frequented and engaged in trouble-making conduct like encouraging a co-worker to report Mrs. McAleer to the IRS because she had Florida license plates. *Ex. G.* The totality of these events led APC to the conclusion that the Accounts Receivable department would function more smoothly without Mrs. Bartlett despite the fact that she was a good collector.

In support of her age claim, Mrs. Bartlett points to three things: (1) a March 22, 2004 meting with Penny Edwards and Edwards' supervisor, Brian Kelly, (2) a meeting with Human Resources Director Brian Gough in late March 2004 and (3) APC hired a 30 year old a short time after her termination. *Ex. B at p. 84, l. 22 - p. 85, l. 12.*

The March 22, 2004 meeting with Edwards and Kelly immediately followed Mrs. Bartlett's Performance Review and was called to address the allegations of improper

sexual conduct that Mrs. Bartlett raised during her review. *Ex. D, No. 6.* Mrs. Bartlett concedes that neither Edwards nor Kelly mentioned anything about Mrs. Bartlett's age. Mrs. Bartlett also did not say anything about her age. *Ex. B at p. 66, ll. 7-17.*

The crux of Mrs. Bartlett's position is that she concluded that Edwards and Kelly thought she was too old to understand the humor in the improper sexual conduct that she had described to Edwards during the Performance Appraisal that led to the meeting. *Ex. B at p. 69, l. 24 - p. 70, l. 11.*[2] Mrs. Bartlett concedes, however, that neither Edwards nor Kelly said anything that led her to that conclusion; it was her unsubstantiated assumption. *Ex. B at p. 69, l. 24 - p. 70, l. 11.* This meeting does not support an age discrimination claim.

Next, Mrs. Bartlett cites her meeting with HR Director Brian Gough as evidence of age discrimination. As promised, Kelly had involved HR to investigate the lunchroom condom incident. The meeting with Gough took place as a follow up to the meeting Mrs. Bartlett had with Edwards and Kelly relating to the alleged improper conduct. At the meeting, Gough informed Mrs. Bartlett that the condom incident had been investigated, Cheryl Darcy had indicated that the matter was intended as a joke, he understood that that Mrs. Bartlett did not see it as a joke and that Cheryl Darcy had been counseled. *Ex. B at p. 70, l. 12 - p. 71, l. 3.*

---

[2] At her March 22, 2004 Performance Appraisal, Mrs. Bartlett revealed for the first time an incident that occurred the prior November in the APC lunchroom at a lunch break. Apparently, several of the female Accounts Receivable employees were eating lunch and discussing Fran Wilcox's new boyfriend when Cheryl Darcy removed a packaged condom from her purse, threw it on the table and said that now Wilcox would be needing this. There is some dispute about how the women at the table reacted at the time. Cheryl Darcy indicated that Wilcox was her friend in and out of work and that the banter was intended and received as a joke, while Mrs. Bartlett maintains that everyone at the table was shocked into complete silence. But there is no dispute that Mrs. Bartlett did not bring the incident to the attention of anyone in management until she raised it in her defense at her March 22nd review. *Ex. B at p. 100 ll. 20-24.*

Mrs. Bartlett maintains that this supports her age claim because "In my mind I feel that they felt if I were a younger person, I wouldn't have complained about it." *Ex. B at p. 73, ll. 5-9.* When pressed to explain the connection between APC's HR department promptly investigating and handling her claim of improper sexual conduct and her age claim, Mrs. Bartlett stated: "Well, the end result – the end result of this, I was terminated and replaced with a 29 year-old woman for no real reason." *Ex. B at p. 74, ll. 9-24.* In fact, the "end result" is that her belief that her meeting with Gough is evidence of age discrimination is nothing more than conjecture and personal opinion that cannot and does not support an age claim.[3]

The third and final piece to Mrs. Bartlett's age claim is her contention that she was replaced by a younger woman. Mrs. Bartlett contends variously that the woman was 29, 30 and in her 30s and that she replaced Mrs. Bartlett immediately, within 2 or 3 weeks, and within 30 days. *Ex. B at p. 80, ll. 22-24; p. 81, ll. 3-12; p. 82, l. 23 -p. 83, l. 13.*[4] As to how this establishes age discrimination, Mrs. Bartlett says: "Well, if you're 63 and you're terminated for reasons you don't understand, and you are replaced by somebody who is 29, what – what other conclusion would you come to?" *Ex. B at p. 83, ll. 19-25.* In other words, this "evidence" is, like the Gough meeting, nothing more than conjecture and speculation.

---

3 Asked to explain the connection between APC properly handling a complaint about another employee and her age discrimination claim, Mrs. Bartlett testified: "Well, that was my personal opinion." *Ex. B at p. 75, ll. 8-14.*

4 Although APC disputes the particulars of Mrs. Bartlett's various contentions, it accepts for purposes of this motion that a younger woman assumed many of Mrs. Bartlett's accounts within a few months of her termination. This woman, like Mrs. Bartlett before her, had already been performing a similar function for APC as a temporary employee on assignment to APC. Several months after Mrs. Bartlett's termination, she moved from her temporary assignment to become an APC employee.

Even assuming this "fact" standing alone could support a *prima facie* case, it does not come close to meeting Mrs. Bartlett's burden to prove age discrimination or overcome APC's legitimate non-discriminatory reasons for her termination. *See, e.g. Thomas,* 144. F.3d at 33 (assuming plaintiff establishes *prima facie* case, plaintiff must prove employer's stated reason is pretext if employer articulates legitimate non-discriminatory reason).

Against the backdrop of Mrs. Bartlett's opinion, conjecture and speculation, is the following undisputed evidence:

- Nobody ever mentioned anything about Mrs. Bartlett's age;
- APC hired Mrs. Bartlett at age 61;
- The supervisor who hired Mrs. Bartlett was 51 when she was hired and almost 54 when she was fired;
- The same supervisor who hired Mrs. Bartlett was a principal decision-maker in her hiring and her firing;
- The APC Treasurer who approved and carried out the termination was 58;
- Eight of the nine employees in Mrs. Bartlett's Accounts Receivable department were within the protected class, as was the supervisor and her supervisor's supervisor;
- Six of the nine employees in the Accounts receivable department were over 50;
- Three of the nine employees in the Accounts receivable department were over 60;
- The two other 60 year olds were not terminated;
- Ms. Bartlett claims that one of the 60 year olds was her supervisor's favored employee; and
- The other 60 year old received a promotion to supervisor at about the time that Mrs. Bartlett was terminated.

To prevent summary judgment, Mrs. Bartlett would have to "elucidate specific facts which would enable a jury to find that the reason given [by the employer] was not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990). When asked in her deposition to explain why Mrs. Bartlett thought she was treated differently than the other two 60 year olds, the following exchange ensued:

A. Because I created problems by challenging Penny Edwards and Brian Kelly. I challenged them and they decided they were going to get rid of me.
Q. For challenging them, right?
A. Yes.
Q. Not because you were too old?
A. Well, that probably entered into it. If I were young – nobody else ever challenged them.
Q. Okay. But it's your testimony that the reason you were terminated as a 60-year-old and that McAleer and Sirrine were not is because you challenged Penny Edwards and Brian Kelly, right?
A. Uh-hum.
Q. Is that a yes?
A. But – but I had more than one reason for filing this suit. Age discrimination was one of them.

*Ex. B at p. 93, l. 12 - p. 94, l. 3.*

This exchange reveals the truth. Mrs. Bartlett was not terminated because of her age, but because of her conduct. The Court should grant summary judgment to APC on Mrs. Bartlett's age discrimination claim.

**3. Mrs. Bartlett was not subjected to a hostile work environment and APC promptly investigated and acted on her sole report of improper sexual conduct.**

In Count III, Mrs. Bartlett claims that she was subjected to a hostile work environment at APC. Her Complaint fails to specify the protected class that supposedly underlies her hostile environment claim, and Mrs. Bartlett testified that she was not subjected to a hostile environment at APC on the basis of her sex or any other protected classification. *Ex. B at p. 134, ll. 2-5; p. 136, l. 22 - p. 138, l. 7.* For this reason alone, her hostile environment claim fails. *See Lee-Crespo v. Schering Plough del Caribe Inc.*, 354 F.3d 34, 44 n.5 (1st Cir. 2003) (*citing Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)) (plaintiff must show that "the severe or pervasive harassment was *because of* gender or one of the other Title VII protected categories").

In fact, this claim appears to be the result of a fundamental misconception as to what Title VII protects her from:

> [I]t shall be an unlawful employment practice for an employer--
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. *42 U.S.C. §2000e-2.*

In her deposition, Mrs. Bartlett contended that Title VII creates a legal obligation for an employer to provide a "safe" working environment and that APC's alleged failure to do so was a violation of Title VII giving rise to a hostile work environment claim. In essence, Mrs. Bartlett's hostile work environment claim distills to the following:

> Well, the – the place obviously was a dysfunctional work environment which we had no supervision. We had no supervisor to go to with any complaints. We were rebuffed by Penny Edwards continuously when we tried to complain about anything, and that dysfunctional environment was to myself and the rest of us hostile. *Ex. B at p. 136, ll. 11-21.*

After denying that her hostile work environment claim was based on her sex, age, race, disability, religion, sexual orientation or national origin, Mrs. Bartlett conceded that her hostile environment claim was not based on membership in any protected class, but stated that, in her view, it did not have to be. *Ex. B at 136, l. 22 - p. 138, l. 7.* Instead, she expressed her view in the following exchange:

> Q. And you're saying even if that dysfunctional working environment isn't because of somebody's protected class, that you're still entitled to a claim under Title VII, is that what you're saying?
> A. Yes, I feel so. *Ex. B at p. 138, l. 25 - p. 139, l. 5.*

APC is entitled to summary judgment because, even if all of the conduct that Mrs. Bartlett alleges occurred just as she says it did and that she was offended by it, the

conduct was not *because of* her membership in a protected category. *Rivera v. P.R. Aqueduct & Sewers Authority*, 331 F.3d 183, 189-91 (1st Cir. 2003) (defendant entitled to summary judgment where court assumed uninvited and rude professional conduct to be severe and pervasive, but plaintiff did not show conduct was because of her religion).

There are also other reasons to grant summary judgment on this claim. The test for determining a hostile work environment discrimination claim is whether: (1) the employee is a member of a protected class; (2) the employee was subjected to unwanted harassment; (3) that harassment was based upon membership in a protected class; (4) the harassment was sufficiently severe and pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) some basis for employer liability has been established. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002). Mrs. Bartlett's hostile work environment claim fails to meet any of the elements necessary to establish her claim.

Mrs. Bartlett does not allege that *she* was the subject of any allegedly harassing conduct. None of the incidents that form the bases for her hostile environment claim directly involved her, nor did she timely report any of them to her supervisor or anyone in a position of authority.[5]

[5] Mrs. Bartlett concedes that the first and only report of "improper sexual conduct" she made to her supervisor or someone in a position of authority was at her March 22, 2004 Performance Appraisal, and that APC immediately addressed the report. *Ex. B at p. 101, ll. 20-24; p. 132, l. 24 – p. 135, l. 4.* She did not report any of the other so-called evidence of hostile environment to her supervisor or anyone in authority. *Ex. B at p. 135, l. 24 – p. 136, l. 10.* She contends that she told her co-worker, George Sirrine,

The hostile environment claim appears to be stem principally from an incident that Mrs. Bartlett first brought to APC's attention on March 22, 2004 during her annual performance review. *Ex. B at p. 100, ll. 20-24; p. 120, ll. 19-23.* This so-called lunchroom condom incident, which actually occurred in or about November 2003, was not directed at her and apparently was not worthy of mention by Mrs. Bartlett until she thought it would somehow assist her defense of her own performance when she was contesting her evaluation. Nevertheless, APC swiftly investigated the claim and took appropriate remedial action even though the conduct itself, while not appropriate for the workplace, hardly would create a hostile environment, even if directed at Mrs. Bartlett. *Ex. B at p. 118, l. 19 - p. 119, l. 4; p. 120, ll. 18-23; p. 122, ll. 3-16; p. 124, l. 25 - p. 126, l. 24; p. 131, ll. 4-7, 18-24; p. 132, l. 25 - p. 133, l. 4.* In fact, Mrs. Bartlett herself conceded that she did not consider the incident to be sexual harassment. *Ex. B at p. 122, ll. 10-16.*

Mrs. Bartlett's true belief about the incident was revealed in a memo she wrote to her supervisors, Penny Edwards and Brian Kelly, on March 22, 2004 after they met with Mrs. Bartlett immediately following her disclosure of the lunchroom incident. The meeting was convened to address Mrs. Bartlett's allegations of "sexual impropriety" that she first raised during her performance review. Lamenting the fact that her meeting with her two supervisors focused on her report of sexual misconduct rather than "the equity and accuracy of the annual performance appraisal," she wrote: "During the discussion with Brian Kelly, the main discussion appeared to be focused upon the issue of sexual impropriety within our department that I raised ... The

---

about comments and things that bothered her, but she concedes that Sirrine had no authority to address her concerns. *Ex. B at p. 100, ll. 8-11; Ex. C at p. 145, ll. 14-17.*

situation in question is not sexual harassment which you and Brian have construed it to be ...." *Ex. B at p. 124, l. 25 – p. 128, l. 24.*

As shown below, Mrs. Bartlett strains to contort the law in a futile effort to show an unlawful hostile environment. More accurately, as Mrs. Bartlett admits, the "hostile" environment to which Mrs. Bartlett refers was the dysfunctional relationship that existed with her female co-workers and supervisor whom did not get along with each other. *Ex. B at p. 143, l. 13 - p. 144, l. 17.*

Apart from the lunchroom condom incident that Mrs. Bartlett first raised months after the fact, the other incidents that Mrs. Bartlett claims are evidence of the hostile work environment are:

- That Beau Lifsey was allegedly allowed to work drunk for 18 months *Ex. B at 133, ll. 5-18; p. 134, l. 22 – p. 135, l. 2;*
- That Cheryl Darcy joked that an APC employee outside of the Accounts Receivable department who wore braces got her position by performing oral sex on her APC management and that was why she needed braces *Ex. B at p. 159, l. 14 – p. 162, l. 1;*
- That the Accounts Receivable department was dysfunctional with no supervision *Ex. B at p.136, l. 11 – p. 139, l. 5;*
- That there was bickering among the women in the department *Ex. B at p. 139, l. 6 – p. 144, l. 17;*
- That Penny Edwards showed favoritism to Mrs. Bartlett's 61 year old co-worker, Dorothy McAleer *Ex. B at p. 145, l. 6 – p. 151, l. 9*; and
- That a co-worker was involved in an incident with a tuna fish sandwich before Mrs. Bartlett began working for APC *Ex. B at p. 162, l. 23 – p. 170, l. 9.*

To reiterate, Mrs. Bartlett concedes that none of the "incidents" that give rise to her hostile work environment claim were based on her membership in any protected class. She also concedes that she never complained about or reported any of these instances to her supervisor or anyone in authority, with the exception of the lunchroom condom incident. As to that incident, as previously stated, she concedes that (a) it was

not sexual harassment of her, (b) it was not based on her membership in any protected class and (c) APC promptly addressed the issue as soon as she disclosed it.

Of the incidents Mrs. Bartlett cites, only two relate to "improper sexual conduct." None of the incidents were directed at her and none individually or collectively are harassment that was "sufficiently severe and pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment" as required by Title VII. In fact, through it all, Mrs. Bartlett insists that she was, by far, her department's best performer. *Ex. C at p. 73, ll. 13-18; see, also n.1 supra.* Also of note, all but one of the Accounts Receivable employees were female, and there is no suggestion that the lone male was involved in the supposed improper sexual conduct.

Mrs. Bartlett's contention that the Beau Lifsey situation created an unlawful hostile environment rests on her mistaken belief that Title VII requires an employer to provide a "safe environment" for people to work in regardless of any connection to protected class status. *Ex. B at p. 113, l. 5 – p. 134, l. 21.* This is simply a misstatement of the law.

Crediting for purposes of this motion Mrs. Bartlett's claim that she was subjected to a hostile work environment because the Accounts Receivable department was allegedly dysfunctional with no supervision,[6] this contention does not support a claim under Title VII. As the *Lee-Crespo* court held, an unprofessional managerial approach along with efforts to assert managerial authority are not the focus of the discrimination laws. 354 F.2d at 46-47.

6 APC does not agree that Mrs. Bartlett's supervisor was unprofessional or incompetent as Mrs. Bartlett contends, but accepts Mrs. Bartlett's contention that she worked in an unsupervised dysfunctional department for purposes of this motion only.

Mrs. Bartlett acknowledged that the favoritism that Edwards allegedly displayed toward McAleer (61 years old when Mrs. Bartlett was terminated) was not based on any protected class, but was based on their friendship. *Ex. B at p. 150, l. 11 – p. 151, l. 4.* While APC takes issue with the allegation of favoritism, even if true, favoritism based on friendship is not evidence of an unlawful hostile work environment. *Foster v. Dalton,* 71 F.3d 52, 56 (1st Cir. 1995) (Title VII does not preclude cronyism that is not motivated by unlawful discrimination).

Similarly, the bickering among her female co-workers that Mrs. Bartlett cites as evidence of an unlawful hostile environment is not cognizable under Title VII. Here, Mrs. Bartlett refers to "constant fights that went on in the – in the department between women, between collectors" that were the product of the apparent dislike of several of the collectors for each other. *Ex. B at 139, ll. 11-13; p. 144, ll. 8-17.* She is not referring to the kind of hostile environment that is unlawful based on Mrs. Bartlett's membership in some protected class.

Mrs. Bartlett concedes that the tuna fish sandwich incident that she cites as evidence of a hostile work environment took place before her arrival at APC. The incident is irrelevant to this matter, her understanding of the event is based on inadmissible hearsay and the Court should not consider the incident. Because Mrs. Bartlett has referenced it repeatedly and will no doubt raise it again, APC addresses the issue.

The tuna fish sandwich incident occurred among co-workers George Sirrine, Cheryl Darcy and Sharon Belisle in 1997, some 5 years before Mrs. Bartlett became an APC employee and 7 years before her termination. Although Mrs. Bartlett is unaware

of the timing of the event, claiming the incident occurred a year before her arrival, the exact timing is immaterial. *Ex. B at p. 163, ll. 3-7; p. 165, ll. 13-17; p. 167, ll. 5-9.* In the incident, for which Sirrine was disciplined, he allegedly pushed a tuna fish sandwich in the face of a co-worker who was hovering over him.

Mrs. Bartlett cites this incident as part of her hostile environment claim because the incident supposedly shows that Sirrine has a temper and "things aren't handled within APC as they would be handled in a normal company." *Ex. B at p. 166, ll. 4-10.* Despite her claim, Mrs. Bartlett believes "George is a lovely, lovely man" and "George and I got along very well. We were quite close as a matter of fact." He never did anything to lead Mrs. Bartlett to believe that there was any problem between George and her. *Ex. B at p. 164, l. 17 - p. 165, l. 1; p. 166, ll. 4-15.*

If, despite the relevance and hearsay issues, the Court considers Mrs. Bartlett's version of the incident, APC contends that this incident, even as incorrectly recounted by Mrs. Bartlett, is not evidence that Mrs. Bartlett was subjected to a hostile work environment for several reasons. First, the incident occurred before Mrs. Bartlett ever worked at APC. Second, the incident did not involve her in any way. Third, the incident was not because of Mrs. Bartlett's membership in any protected class. Fourth, the incident was not evidence of a severe and pervasive hostile environment at the time Mrs. Bartlett worked at APC or when she was terminated. Fifth, APC promptly disciplined Sirrine for his role when the incident occurred years earlier, and Mrs. Bartlett does not contend that the discipline was ineffective or that Sirrine ever again engaged in similar conduct with her or anyone else. Finally, Mrs. Bartlett acknowledged that she and Sirrine had no problems and got along very well. Thus, the

incident was not subjectively hostile to her. The incident simply is not evidence of an unlawful hostile work environment in 2004 that affected Mrs. Bartlett.

Additionally, even if Mrs. Bartlett were subjectively offended by one or more of the incidents she cites, the incidents are not objectively offensive, such that a reasonable person would find the environment hostile or abusive. *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 19 (1st Cir. 2002) (*quoting Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000) ("the workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins"). Cheryl Darcy's comments were jokes that were in the nature of stray comments. While Mrs. Bartlett may have found them crude and they may have been inappropriate in the workplace, they do not constitute pervasive or severe harassment, especially when stated by one woman about another woman and when the claimant is not even the subject of the comments. Courts repeatedly hold that Title VII is not intended to rid the workplace of all conduct that a plaintiff might find objectionable. *See, e.g. Lee-Crespo*, 354 F.3d at 37 ("Title VII is neither a civility code nor a general anti-harassment code").

The other incidents, even if they occurred as alleged by Mrs. Bartlett, are simply not the type of conduct proscribed by Title VII. Instead, they are evidence that Mrs. Bartlett did not particularly care for most of the people she worked with, had no respect for her supervisor and was generally unhappy in her workplace.

Finally, no basis for employer liability has been established as required by Title VII. To establish employer liability in cases alleging harassment by a non-supervisory co-worker, Mrs. Bartlett must demonstrate that APC knew or should have known of the

charges and failed to implement prompt and appropriate action. *Crowley*, 303 F.3d at 401. In this case, she can do neither.

Mrs. Bartlett acknowledges that APC has in place policies and procedures for addressing hostile environment and other discrimination related complaints. She admits that she knew the procedure allowed her to bring complaints to her supervisor, other members of management and to the Human Resources department. *Ex. B at p. 36, ll. 6-18; p. 40, l. 14 – p. 44, l. 3.* She also admits, as previously described, that her only report to a supervisor or someone in authority at APC was the lunchroom condom incident that APC promptly and appropriately addressed. Under those circumstances, Mrs. Bartlett has failed to meet her burden to establish that APC knew or should have known of the incidents she now complains of or failed to implement prompt and appropriate action.

For these many reasons, Mrs. Bartlett has neither presented nor proved a cognizable claim that she was subjected to an unlawful hostile environment and this Court should grant APC summary judgment on this count.

**4. APC did not retaliate against Mrs. Bartlett and she fails to articulate any protected conduct that APC purportedly retaliated against her for.**

Mrs. Bartlett claims in Count IV that she was retaliated against for whistleblowing, but her Complaint does not identify the protected conduct she purports to have engaged in that caused APC to retaliate against her. In her deposition, Mrs. Bartlett contends that APC "retaliated against me because I challenged their - their- Penny Edwards and Brian Kelly and Brian Gough. I was a wonderful employee until I challenged these managers and their managerial acumen." Once Mrs. Bartlett

challenged Penny Edwards during her March 22, 2004 Performance Appraisal, APC began to retaliate against her, she claims. *Ex. C at p. 15, l. 12 – p. 16, l. 9.*

Significantly, Mrs. Bartlett acknowledges that the "retaliation" was for challenging Edwards relating to her dispute over her March 22, 2004 Performance Appraisal and Edwards' management style, *and for no other reason*. The following exchange from Mrs. Bartlett's deposition crystallizes her contention:

> Q. And the reason that they were retaliating against you was because of your challenging of Penny Edwards' management?
> A. Exactly.
> Q. And the challenging of Penny Edwards' management that you're referring to had to do with your dispute with her over the performance review that she was giving you?
> A. Yes.
> Q. Did your challenge of Penny Edwards also relate to your disagreement with her management style?
> * * *
> A. Yes.
> Q. Did your challenge of Penny Edwards relate to anything other than your dispute over the performance review that you'd been given and Ms. Edwards' management style?
> A. No.
> Q. And is it your contention that because of your challenge of Penny Edwards at this performance review, that Ms. Edwards set out to take some action against you?
> A. Definitely.
> Q. Okay. And in your view, that's because she was upset with you for having challenged her management authority?
> A. Absolutely.

*Ex. C at p. 16, l. 10 - p. 17, l. 15.*

To prevail on her retaliation claim, Mrs. Bartlett must allege and prove that (a) she participated in a protected activity known to APC; (b) she suffered an adverse employment action; and (c) there is a causal connection between the protected activity and the adverse employment action. *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997); *Blackie v. State of Maine*, 75 F.3d 716, 722 (1st Cir. 1996). From the cited testimony, it is

clear that Mrs. Bartlett does not even contend that she was retaliated against for engaging in protected conduct. Nor can she establish that there is any relationship between any protected activity and the adverse employment action she suffered.

Mrs. Bartlett points to the following alleged actions as being retaliatory conduct:

- Edwards caused her to be summoned to meet with HR Director Gough *Ex. C at p. 17, ll. 16-21;*
- Edwards colluded with others to set her up for a search for guns and knives *Ex. C at p. 18, l. 12 – p. 19, l. 6;*
- Edwards and Gough colluded with Darcy, McAleer and Sirrine to cause them to make statements to HR about Mrs. Bartlett *Ex. C at p. 19, ll. 7-11;*
- Gough and APC's attorney improperly convinced the EEOC not to investigate her claim *Ex. C at p. 22, l. 7 – p. 25, l. 11;* and
- Gough retaliated against her by feeding information about Mrs. Bartlett's alleged Rhode Island mob membership to APC's attorney for disclosure to the EEOC in APC's Position Statement *Ex. C at p. 42, ll. 7-25.*

Mrs. Bartlett ties each of the above incidents to her challenge of Edwards' management, *not* to her participation in any protected conduct. Such "retaliation," even if it occurred, is not prohibited conduct under Title VII *unless* it is causally related to Mrs. Bartlett's exercise of some protected conduct.[7] Her own testimony establishes that it was not. Even if Mrs. Bartlett claimed she participated in some protected conduct, she is not insulated from adverse employment actions that are not related to the protected conduct. *Blackie*, 75 F.3d at 723-24 (by engaging in protected conduct, employee does not acquire immunity from risks that confront any employee).

---

7 As will be demonstrated *infra*, Mrs. Bartlett has no facts to support her contentions that there was any collusion or conspiracy to take any action against her, whether that action was related to her challenge of Edwards' management authority or to some undisclosed protected conduct. However, APC admits that it conducted a limited search of Mrs. Bartlett's handbag in response to Cheryl Darcy's report to HR that Mrs. Bartlett had been overheard to say that she carried a pistol in her purse. APC also admits that Darcy, McAleer and Sirrine also either reported or confirmed to HR reports that Mrs. Bartlett claimed to have connections in the Rhode Island mob that could get things done for her, that she had access to guns and knives, that she wished a terrorist would bring down the plane on which McAleer flew to and from Florida, that some co-workers were threatened and intimidated by her and that she encouraged another co-worker to report McAleer to the IRS because she had Florida license plates. Sirrine also confirmed the tension she created in the department and questioned Mrs. Bartlett's stability. Edwards also reported to HR that Mrs. Bartlett had threatened her after the handbag search. *See Exs. E, F and G.*

Now, to the specifics acts of retaliation that Mrs. Bartlett alleges. As for the "retaliatory" act of Edwards causing Mrs. Bartlett to be summoned to a meeting with HR Director Gough, she acknowledges that this meeting was called so that Mrs. Bartlett could discuss with Gough her dissatisfaction with her Performance Appraisal. At that meeting, Gough told her that she could prepare her own rebuttal to Edwards' Performance Appraisal and it would be included in her personnel file along with Edwards' Performance Appraisal. *Ex. C at p. 17, l. 16 – p. 18, l. 8.* She did and it was. There is no evidence that this meeting was called for punitive reasons or that she suffered any adverse consequence because of it.

Mrs. Bartlett also freely admits that she has no evidence to support her other contentions. Instead, they are utter speculation and conjecture fueled by her obvious dislike of Edwards, her co-workers and APC. With reference to her conspiracy allegation involving Edwards, Darcy, McAleer, Sirrine, Gough and APC's EEOC attorney, Mrs. Bartlett testified as follows:

> Q. What facts do you have that Penny Edwards caused George Sirrine, Dorothy McAleer and Cheryl Darcy to make the statements that you're saying that she caused them to make?
>
> * * *
>
> A. I have no facts.
> Q. So it's speculation?
> A. Speculation which I'm sure will come out when – when they are subpoenaed and they have to give their testimony and witnesses that will –
> Q. And what facts do you have that Penny Edwards caused the handgun search by colluding with others to set the search up?
> A. Well, I – I don't have any fact that she definitely – in fact, she denied that she had anything to do with it; that it was, quote, someone else.
> Q. So you have no facts that support your belief that Penny Edwards caused the handgun search?
> A. No, except that it's my personal opinion.
>
> * * *
>
> Q. Is it your contention that Brian Gough and/or APC's attorney somehow improperly convinced the EEOC not to investigate your claim?

A. Absolutely.
Q. How?
A. I don't know how. I think the attorney made a call and said this woman is a whack job or caused problems and we're going to handle it from here.
Q. All right. So you don't know how it happened but somehow APC's attorney was able to persuade the EEOC that your claim should not be pursued?
A. Right. And they never looked – the EEOC never pursued or looked into my claim.

*Ex. C at p. 20, l. 12 – p. 21, l. 9; p. 23, ll. 11-25.*

Mrs. Bartlett's accusations, founded as they are on speculation and personal opinion but no facts, are not admissible evidence supporting a claim for retaliation, even if she alleged a causal relationship to some protected conduct. *Mesnick v. General Electric Co.*, 750 F.2d 816, 822 (1st Cir. 1991) (conjectural evidence insufficient to defeat summary judgment).

Mrs. Bartlett admits that the performance rating and the review she received on March 22, 2004 were not in retaliation for anything. *Ex. C at p. 21, ll. 19-22.* All of the actions that Mrs. Bartlett claims were retaliatory took place after Mrs. Bartlett strongly disagreed with Edwards' assessment of her performance and, in fact, some of the actions she cites either occurred or first became known to her long after her termination – during the EEOC proceeding and this litigation. *Ex. B at p. 57, ll. 7-16.*

Although Mrs. Bartlett is entitled to disagree with APC's reasons, it was Mrs. Bartlett's behavior toward her supervisor and co-workers, her overreaction to her performance review and to the handbag search, her threatening conduct toward Edwards after the search and the reports of her co-workers that led to her demise. It is not enough for Mrs. Bartlett to disagree with APC's reasons. The issue is whether APC believed its stated reason to be credible. *Mesnick*, 750 F.2d at 824. Mrs. Bartlett may disagree that she was disruptive and may deny that the things that were reported to HR

actually happened, but there is no dispute that the *reports were made* to HR and that APC was entitled to make employment decisions based on those reports. In fact, Mrs. Bartlett said so herself:

> Q. But in terms of the reason that you were given, you don't dispute that if an employer believes that an employee is causing problems with other employees, that they can be terminated.
> A. Of course, I agree with that.

*Ex. B at p. 79, ll. 16-20.*

Courts do not act as super Human Resources departments, looking over the shoulders of the decision-makers to substitute their judgment for the employers'. *LeBlanc,* 6 F.3d at 847; *Mesnick,* 750 F.2d at 825. Rather, courts look to see if plaintiffs have presented any evidence that can sustain a retaliation or discrimination claim. Here, Mrs. Bartlett has simply presented no evidence that she engaged in any protected conduct or that the cited acts were in retaliation for any protected conduct. The Court should award summary judgment to APC on this count.

**5. Mrs. Bartlett's claims of defamation, libel and slander fail because the statements were not defamatory, APC did not publish some of the statements and, to the extent that APC published any statements that form the bases of her claim, the publications were privileged.**

In Count V, Mrs. Bartlett claims that APC defamed, libeled and slandered her. In order to establish a claim of defamation, libel or slander, a plaintiff must prove (a) communication of a false and defamatory statement concerning another; (b) an unprivileged communication to a third party; (c) fault amounting to at least negligence; and (d) damages. *Mills v. C.H.I.L.D. Inc.*, 837 A.2d 714, 720 (R.I. 2003). If a communication is privileged, the plaintiff must also prove that the primary motivation for the communication was the publisher's ill will or spite. *DiBlasio v. Brown & Sharpe Mfg. Co.,* 525 A.2d 489, 492 (R.I. 1987).

In general, this claim is founded on APC's response to the reports of co-workers to management about Mrs. Bartlett, APC's actions in connection with Mrs. Bartlett's termination and its response to the administrative and judicial proceedings she brought. Even if the statements could be deemed defamatory or libelous, APC did not initiate most of these statements and those that it did initiate are privileged. None of the statements can be the foundation of a claim against APC.

In her deposition, Mrs. Bartlett identified the following statements that she claims were defamatory, libelous and slanderous:

- APC's statement that Mrs. Bartlett carried a gun and knives *Ex. C at p. 44, ll. 1-6;*
- APC searched her handbag for a handgun *Ex. C at p. 44, l. 6;*
- APC's attorney's statement to the EEOC that Mrs. Bartlett was a member of the Rhode Island mob *Ex. C at p. 44, ll. 6-8;*
- Susan Sutherland's statement that Mrs. Bartlett caused problems within the department *Ex. C at p. 44, ll. 8-10;*
- APC's Interrogatory Answer and EEOC Position Statement stating "some nonsense about a terrorist on a plane" *Ex. C at p. 44, ll. 14-17; p. 62, l. 20 - p. 63, l. 1;*
- APC's Interrogatory Answer relating Cheryl Darcy's comment that Mrs. Bartlett carried knives and guns, and that Darcy was not afraid of Mrs. Bartlett but sometimes people snap *Ex. C at p. 44, ll. 17-19;*
- It was made known that Mrs. Bartlett was not an employee in good standing and was terminated *Ex. C at p. 44, ll. 19-23; p. 65, ll. 9-15;*
- APC advised the state unemployment office that Mrs. Bartlett was terminated for poor performance *Ex. C at p. 45, ll. 2-5.*

The first claimed defamatory statement is based on Brian Gough's statement *to Mrs. Bartlett* that a co-worker had reported to HR that she may carry a handgun. The statement was made in connection with APC's search of Mrs. Bartlett's handbag, a search which she acknowledges APC had the right and duty to conduct.

This statement cannot support a defamation claim for several reasons. First, the statement itself is not defamatory as a matter of law. A statement is defamatory if it is false and malicious and imputes conduct that is injurious to a person's reputation, tends

to degrade her in society or bring her into public hatred or contempt. *Mills*, 837 A.2d at 720. Telling someone that it has been reported that she may carry a handgun does not fit this description. Second, the statement was not published to a third party as required; it was made to her. Third, the statement was made to her as part of an investigation that Gough had an obligation to conduct.

APC's search of Mrs. Bartlett's handbag was neither defamatory nor libelous. It was not an oral or written statement. It was an action that APC conducted as part of its efforts to insure compliance with its policies. Mrs. Bartlett accepts and understands the search policy; she just doesn't think it should be applied to her:

> Q. So do you consider it to be unreasonable for an employer to search the handbag of somebody who has been reported to be carrying a handgun in their handbag?
> A. Absolutely. In this context absolutely.
> Q. Because it was you?
> A. Because it was me.
>
> * * *
>
> Q. In any event, if you made a report to APC management that you believe one of your co-workers was carrying a handgun in her handbag, would you expect APC to conduct a search of that employee?
> A. If I made the - the report?
> Q. Yes.
> A. Yes.

*Ex. C at p. 50, ll. 14-20; p. 53, ll. 2-9.*

This action is not defamatory or libelous as a matter of law. In fact, it is the action of a responsible employer.

Mrs. Bartlett's third claimed actionable statement is contained in APC's Position Statement filed with the Equal Employment Opportunity Commission ("EEOC"). APC's Position Statement explained to the EEOC some of the events giving rise to the decision to terminate Mrs. Bartlett, including certain comments that Mrs. Bartlett was reported to have made that caused her co-workers to be apprehensive about her. The

statement that Mrs. Bartlett says libeled her was APC's disclosure that co-workers had claimed that Mrs. Bartlett touted her connections to the Rhode Island mob by claiming she could pick up the phone and have certain situations taken care of.

Mrs. Bartlett does not dispute that the *report* was made to APC, although she denies that she ever made the statement. Whether Mrs. Bartlett ever made the statement and whether the co-worker who reported the statement may have defamed Mrs. Bartlett are not at issue. The issue is whether APC's inclusion of this report, that it undeniably received, in its EEOC Position Statement is libelous.

Communications made in judicial proceedings are absolutely privileged. *Vieira v. Meredith*, 84 R.I. 299, 301, 123 A.2d 743, 744 (1956); *Kissell v. Dunn*, 793 F. Supp. 389, 391 (D.R.I. 1992). APC had a legal right, if not a duty, to relate to the EEOC the reasons underlying its decision to terminate Mrs. Bartlett. Among those reasons were that certain employees reported to APC that they were concerned about statements and actions attributed to Mrs. Bartlett.

The fourth communication underlying Mrs. Bartlett's defamation claim is the explanation for her termination that Susan Sutherland gave *to Mrs. Bartlett* in her exit interview - that Mrs. Bartlett caused problems with others in the department.[8] *Ex. C at p. 57, ll. 3-25.* Once again, the statement does not meet the definition of a defamatory statement. Telling someone why they are being let go is not a statement that is false and malicious and that imputes conduct that is injurious to a person's reputation, tends to

---

[8] Mrs. Bartlett also claims that Sutherland's failure to provide her with further detail on those problems was defamatory. This statement comes from her overall failure to understand the legal basis for a defamation claim. She says "a defamation claim within a corporation is – a corporation is forced to follow their policies. If they don't, they – they have precedents set. They just can't – your boss can't just come in and say, 'You know what, Mr. Palmer? We've decided that you're – you can't work here any longer. Nobody likes you. Get out.'" She acknowledges not having conducted any legal research before filing her defamation claim. *Ex. C at p. 57, l. 21 – p. 60, l. 1.*

degrade her in society or bring her into public hatred or contempt. *Mills*, 837 A.2d at 720. And here again, the statement was not published to a third party; it was made to her.

The fifth statement comes from the Interrogatory Answers that APC served on Mrs. Bartlett and the Position Statement that APC submitted to the EEOC. In those documents, APC repeated the report made to APC by co-workers that Mrs. Bartlett had expressed a wish that a terrorist would bring down the plane that Dorothy McAleer flew on to visit her husband in Florida as an example of the kind of comments involving co-workers that led to Mrs. Bartlett's termination. In each case, APC was responding to a request made in legal proceedings for an explanation of why Mrs. Bartlett had been terminated. The statements are privileged and cannot be libelous, even if the substance of the statement was defamatory. *Vieira*, 84 R.I. at 301, 123 A.2d at 744. Mrs. Bartlett acknowledges that APC did not state to the EEOC that Mrs. Bartlett actually made the terrorist statement, but was simply restating what had been told to APC. *Ex. C at 63, ll. 2-9.*

The sixth statement that Mrs. Bartlett cites is APC's Interrogatory Answer in which APC informed Mrs. Bartlett that Cheryl Darcy had made a statement to APC that Mrs. Bartlett had access to guns and knives and was concerned because people sometimes snap. The statement was defamatory according to Mrs. Bartlett because APC "had no right to make – transfer those comments to the EEOC without investigating them thoroughly and they knew – they knew that these comments were coming from a troubled employee who had given them nothing but trouble and – and is documented, not only by witnesses, by former employees and current employees. * * *

So taking the word of Cheryl Darcy and relaying that, yes, APC is absolutely responsible for that slander." *Ex. C at p. 67, ll. 1-21.* APC's Interrogatory Answer and EEOC Position Statement are privileged, and thus cannot be libelous or defamatory. *Vieira*, 84 R.I. at 301, 123 A.2d at 744; *Kissell*, 793 F. Supp. at 391. Moreover, saying that someone has access to guns and knives or may carry a gun is not defamatory as a matter of law.[9]

Next, Mrs. Bartlett claims that APC defamed her when it was made known that she was no longer an employee in good standing. *Ex. C at p. 67, l. 25 – p. 68, l. 4.* She cannot identify anyone at APC who actually made such an oral or written statement. It was a rumor, she says, and employees were gossiping about her no longer being in good standing. *Ex. C at p. 68, l. 18 – p. 69, l. 20.* APC is responsible in defamation, according to Mrs. Bartlett, for her co-workers gossiping about Mrs. Bartlett having been let go because she was no longer an employee in good standing; not because of any oral or written statement that APC made. *Ex. C at p. 71, l. 17 – p. 72, l. 11.*

Finally, Mrs. Bartlett asserts that APC libeled her by reporting to the Rhode Island Department of Labor & Training ("DLT") that Mrs. Bartlett had been terminated for poor performance. *Ex. C at p. 72, ll. 12-17.* She contends that the statement defamed her because it was a lie - "I was the top performer" and "I have perfect conduct." *Ex. C at p. 72, ll. 18-22; p. 73, l. 24 – p. 74, l. 1.*

The statement itself, that someone was discharged for poor performance, is not defamatory as a matter of law. Moreover, APC's report was on a form that is required to be submitted to the DLT and that calls for a short explanation of the reason for an

---

9 Mrs. Bartlett herself told her co-workers that she was a lifelong member of gun clubs and that she had used firearms throughout her life. She was very proud of her use and access to guns. *Ex. C at p. 119, l. 12 – p. 120, l. 23.*

employee's separation. The statement is subject to at least a qualified privilege. An employer's communication about an employee's conduct is qualifiedly privileged if the employer correctly or reasonably believes the communication is necessary in order to protect a common interest or the publisher has a legal, moral or social duty to speak out. *Ponticelli v. Mine Safety Appliance Co.*, 104 R.I. 549, 551, 247 A.2d 303, 305-06 (1968); *see also Kissell,* 793 F. Supp. at 391 (employer's statement to state unemployment office is absolutely privileged) (applying Connecticut law); *Thomas,* 144 F.3d at 34 (an employee cannot maintain an action for libel or slander based on comments made about him in internal company feedback and deficiency memoranda) . Even if the statement to the DLT is only entitled to a qualified privilege, there is no evidence that the primary motivation for the communication to DLT was out of APC's ill will or spite. *DiBlasio,* 525 A.2d at 492. Hence, this statement, even if untrue, is not defamatory or libelous.

The Court should grant summary judgment to APC on Mrs. Bartlett's claim for defamation, libel and slander.

## III. CONCLUSION

APC did not terminate Mrs. Bartlett for a proscribed reason and did not engage in any unlawful conduct with respect to her treatment or her termination. Mrs. Bartlett misperceives the protection that Title VII and defamation law provide, and she is unable to prove her claims as a matter of fact or law. Based on the foregoing facts and the applicable law, APC asks this Court to grant summary judgment in its favor on all counts (Counts I-V) of Plaintiff's Complaint.

**Natalie Gill Bartlett**
**vs.**
**American Power Conversion Corporation, *et al.***
**C.A. No. 05-084 ML**

AMERICAN POWER CONVERSION CORPORATION
By its Attorneys,

Gardner H. Palmer, Jr. Esq. (#3707)
RODIO & BROWN, LTD.
91 Friendship Street
Providence, RI 02903
401 274-4040
401 274-4099 Fax
gpalmer@rodiobrown.com

Date: January 16, 2006

## CERTIFICATION

Natalie Gill Bartlett
45 Lakeside Drive
Narragansett, RI 02882

I hereby certify that I sent a copy of the within document to the party listed above by regular, first class mail, postage prepaid on the 17th day of January, 2006.

Helena Amaral