**EXHIBIT NO. 3**

A copy of page no. 3 of defendant outside counsel dated November 2, 2004 including footnote no.2 that refutes the validity of the Dorothy McAleer and George Sirrine statements in exhibits no. 2.b. and 2.d.

her to discuss the allegation. Tellingly, Complainant expressed little interest in talking about the lunchroom incident with Mr. Kelly and instead wanted to focus on the performance appraisal. Complainant criticized the accuracy of the "meets expectations" appraisal and wanted to review the rankings with Mr. Kelly. Complainant grew annoyed at Mr. Kelly's attempts to focus her on the alleged lunchroom incident. She told Mr. Kelly that "the situation in question is not sexual harassment." Instead, according to Complainant, she raised the issue because she believed Ms. Darcy's behavior over the prior two and one-half years was inconsistent with APC's values (in other words, she wanted to blame Ms. Darcy for any friction in the department). Nevertheless, Mr. Kelly elevated the lunchroom issue to APC's Human Resources Department, which then conducted an investigation into the conduct and addressed the issue with Ms. Darcy directly.[1]

In the weeks that followed, Complainant continued to cause problems within the department. Complainant frequently touted her connection to the Rhode Island "mob" by claiming that she could pick up the phone and have certain situations "taken care of." She also boasted that she had access to guns and knives.[2]

Complainant left her co-workers so ill at ease that one even reported a fear that Complainant may actually have kept a gun in her purse. APC could not ignore a report that an employee may have been bringing a gun to work and felt it had a duty to investigate this allegation. Thus, on April 28 – more than a month after Complainant's performance review – Human Resources Director Gough discreetly called Complainant to a meeting with one of APC's security personnel. After learning of the allegation against her, Complainant agreed that it was responsible of APC to investigate and consented to a brief search of her handbag, limited to ensuring that it contained no weapons. When the search yielded nothing, Complainant was excused without any adverse consequences.

Like with her performance evaluation, Complainant's subsequent response to this incident was far more severe than the inconvenience, albeit an unusual one, warranted. After her meeting with Mr. Gough, Complainant went to Supervisor Edwards' office and demanded to know whether she had been the one to report the alleged handgun comment. Ms. Edwards replied that she had not. In a loud and angry voice, Complainant claimed that someone was going to pay. When Ms. Edwards asked if Complainant was threatening her, Complainant replied, "Yes."

---

[1] APC's Human Resources Director, Brian Gough, met with Complainant on March 24. Once again, Complainant was bent on focusing on her dissatisfaction with the performance appraisal. Mr. Gough encouraged Complainant to formally respond to her evaluation, but cautioned her that Ms. Edwards' evaluation was her professional opinion and would stand. He explained that her complaints about Ms. Edwards and Ms. Darcy sounded more like personality conflicts and not like prohibited discrimination. Complainant agreed that discrimination was not an issue.

[2] Another example of Complainant's interpersonal relations issues is her workplace comment that she hoped terrorists would hijack an airline flight frequented by a co-worker.

EXHIBIT NO. 3